**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4758-17T2

MARK P. GARDNER,

     Plaintiff-Appellant,

v.

METROPOLITAN AMERICA
and KEC PROSPECT, LLC,

     Defendants-Respondents.

_____

Argued telephonically December 3, 2019 –
Decided August 10, 2020

Before Judges Hoffman, Currier, and Firko.

On appeal from the Superior Court of New Jersey, Law
Division, Essex County, Docket No. L-3248-15.

James C. Mescall argued the cause for appellant
(Mescall & Acosta, PC, attorneys; James C. Mescall,
on the briefs).

Danielle M. DeGeorgio argued the cause for
respondents (Faust, Goetz, Schenker & Blee, LLP,
attorneys; Randy Scott Faust, of counsel; Danielle M.
DeGeorgio, on the brief).

PER CURIAM

In this slip-and-fall premises liability case, plaintiff appeals from the order of judgment entered by the Law Division after a jury returned a no-cause verdict, allocating sixty-one percent of fault to plaintiff and thirty-nine percent to defendants. The court also denied plaintiff's post-trial motions for judgment notwithstanding the verdict (JNOV) and a new trial. Plaintiff contends improper questioning regarding his ex-wife tainted the jury and unfairly prejudiced him; in addition, he argues the verdict was against the weight of the evidence. We affirm, discerning no basis to reverse the judgment under review.

I

We derive the following facts from the trial record. At approximately 7:45 a.m. on January 18, 2015, plaintiff, then a fifty-one-year-old longshoreman, exited his apartment building located at 49 Prospect Street in East Orange, using the front walkway while carrying a duffel bag of laundry. Defendant KEC Prospect LLC owns the building and defendant Metropolitan America maintains the premises. The walkway in front of the building consisted of a flat concrete slab extending approximately twenty feet towards the street.

After stepping off the front steps and traversing several steps across the front walkway, plaintiff stepped onto a patch of ice and fell, injuring his left

knee. Unable to get up, plaintiff called 9-1-1 and asked a passerby for assistance. Thirty minutes later, emergency medical technicians arrived and transported plaintiff to a local hospital. There, plaintiff was examined, x-rayed, prescribed pain medication, provided with a knee immobilizer, and released with instructions to follow up with a physician. Two weeks later, a magnetic resonance image confirmed a tear in plaintiff's left patella tendon, such that it was no longer attached to the bone. On February 4, 2015, Dr. Ainsworth Allen surgically reattached the severed tendon.

On May 13, 2015, plaintiff filed this action alleging defendants negligently failed to maintain the premises at 49 Prospect Street. A ten-day trial commenced on February 26, 2018. We highlight those portions of the trial record pertinent to the issues raised by plaintiff on appeal.

Plaintiff testified that when he exited his apartment building on January 18, 2018, he saw "a light coating of snow and moisture" on the ground adjacent to the walkway; however, he did not notice any precipitation or ice on the concrete walkway. Plaintiff then continued down the walkway with "[his] usual stride" before his right foot slipped out from underneath him and he landed with his full body weight on his left shin. At that point, plaintiff observed a clear patch of ice, approximately four-square feet, which caused him to fall.

Brett Zweiback, plaintiff's meteorology expert, testified that a freezing drizzle began to fall at approximately 6:41 a.m., about an hour before plaintiff's fall, and it turned into freezing rain at approximately 7:55 a.m. Zweiback also testified that the National Weather Service issued a freezing rain advisory the day before the accident. On cross-examination, he acknowledged there was a visible freezing drizzle as plaintiff exited his building.

Dr. Steven Nehmer, an orthopedic surgeon, testified as plaintiff's medical expert based on his review of Dr. Allen's records of plaintiff's surgery.[1] On cross-examination, defense counsel asked Dr. Nehmer whether Dr. Allen "wrote in his operative report that [plaintiff] sustained a non[-]traumatic rupture of the patella tendon, is that what Dr. Allen wrote in the records that you reviewed?" Plaintiff's counsel immediately objected and the trial judge sustained the objection, citing James v. Ruiz, 440 N.J. Super. 45 (App. Div. 2015). The trial judge then instructed the jury to disregard the question and answer.

Similarly, when cross-examining plaintiff later at trial, defense counsel again attempted to inquire into Dr. Allen's findings by asking whether he recommended plaintiff lose weight to assist with the recovery of his knee and if plaintiff was "discharged without any instruction to ever return to [Dr. Allen.]"

---

[1] Dr. Allen, whose practice is based in New York City, did not testify at trial.

The trial judge sustained both of plaintiff's objections. Defense counsel also commented on Dr. Allen's absence at trial during his summation. Plaintiff objected and the trial judge sustained the objection, instructing the jury to "disregard what counsel just said because Dr. Allen is a doctor in New York and since he's in New York[,] he's out of New Jersey's jurisdiction so neither party could have compelled Dr. Allen to be here and testify in this trial."

George Browning, a longshoreman and former co-worker of plaintiff, testified regarding plaintiff's industrious work ethic and the day-to-day job duties of longshoremen. He also testified that plaintiff is a good man and was the minister who married him. On cross-examination, defense counsel questioned Browning about plaintiff's marriage:

> Q: Finally, sir, were you friend[s] with [plaintiff] when he separated from his wife?
>
> A: Yes.
>
>  . . . .
>
> Q: And were you friends with [plaintiff] when he ultimately was divorced from his wife?
>
> A: Yes.
>
> Q: And, sir, are you aware – during that time that you were friends with him, that his wife claimed that she was afraid of him?

A-4758-17T2

Before Browning could answer, plaintiff's counsel objected. The trial judge sustained the objection and instructed the jury to disregard the question. At sidebar, plaintiff's counsel requested an additional curative instruction. The trial judge then instructed the jury, "Ladies and gentlemen, I'll just tell you again to disregard that question and disregard that answer. Because it was an inappropriate question and that has nothing to do with this case. So please, disregard that."

Following Browning's testimony, plaintiff moved for a mistrial, or in the alternative, requested the judge voir dire the jurors to ascertain their experience with divorce and domestic violence. The judge denied both applications. Regarding plaintiff's motion for a mistrial, the judge ruled,

> During the testimony of Mr. Browning, Mr. Browning was asked about [plaintiff] and . . . said he was a minister and that he – in fact, he married Mr. Browning and then there was extensive testimony about the charitable activities that [plaintiff] participated in to show that [plaintiff] has a good character. So it was brought up by [plaintiff's counsel].
>
> The [improper] question was asked . . . [and] objected to. The [c]ourt instructed the jury twice – not once but twice[,] based upon [plaintiff's counsel's] request[,] to disregard the question. It's the [c]ourt's decision that the curative instruction is enough . . . and the [c]ourt is going to deny the motion for a mistrial . . . .

A-4758-17T2

The judge also declined to voir dire the jury, noting "the question was whether or not [plaintiff's] ex-wife was afraid of him. There was no mention of domestic violence. The [c]ourt finds that it [would not] be appropriate to question the jury."

Nevertheless, to further mitigate any perceived prejudice, the trial judge ruled he would permit plaintiff to testify regarding his marital relationship. Plaintiff then explained that he learned his wife had an affair, and when confronted about it, she asked him to leave the family home. Plaintiff remained in the family home because he had nowhere to go; at that point, his wife threatened to call the police and "tell them I'm afraid of you, to get you the F-out [of] this house[.]" Plaintiff further testified there was no charge of domestic violence and no complaints had been filed against him.

On cross-examination, defense counsel questioned plaintiff about him living with a childhood friend, who is a woman, after his injury. Plaintiff objected. The judge sustained the objection and instructed defense counsel to refrain from pursuing this line of questioning.

David Behnken, a civil engineer, testified as an expert for defendants. Although Behnken conceded that "what [plaintiff saw] in front of him [was] concrete because the ice [was] clear," he nevertheless testified that plaintiff's

A-4758-17T2

injuries were primarily his fault because, in Behnken's opinion, he failed "to look at his intended path of travel[.]" When cross-examined concerning the basis for his conclusion, Behnken said he relied on plaintiff's deposition testimony. At that point, plaintiff's counsel read the following portion of plaintiff's deposition into the record:

> Q: [A]nd then you kept looking up until the accident happened? . . .
>
> A: I kept walking, yes, because I was off the steps.
>
> Q: So you're looking straight ahead as you are walking across the slab prior to the accident?
>
> A: Yes.
>
> Q: Were you looking at anything in particular? Were you looking across the street? Were you looking at [a] vehicle?
>
> A: Just looking, just walking.
>
> . . . .
>
> Q: Okay. So from the time that you walked down the steps until the accident, you walked across the slab. You didn't look down again prior to the accident?
>
> A: No. Not to see where I was going. No. . . .
>
> . . . .
>
> Q: And you were looking straight ahead, correct?

A:    Yes.

Based on this testimony, Behnken maintained plaintiff "wasn't looking at his intended path of travel. Looking straight ahead could be anything and I believe, as the jury knows, he didn't look down prior to his fall."

Regarding the applicable city code, Behnken opined that defendants' "actions were reasonable and within the standard industry custom and practice, as well as the required code." He testified that Chapter 159 of the East Orange city code addressed the maintenance of the exterior of a premise, and that it required a property owner to remove accumulated snow and ice "where such snow or ice remains uncleared for more than four hours of daylight after determination of the snowfall on commercial properties." Therefore, Behnken concluded, defendants were not in violation of the city code because the freezing rain event started less than an hour before plaintiff's injury. Furthermore, Behnken testified East Orange does not require commercial property owners to pre-salt or pretreat common walkways.

On March 13, 2018, the jury returned its no cause verdict in favor of defendants. By a vote of seven to one, the jury found that defendants were negligent in maintaining the walkway and that their negligence was a proximate cause of plaintiff's injuries. By a vote of eight to zero, the jury also found that

9

plaintiff was negligent and that his own negligence was a proximate cause of his injuries. The jury allocated sixty-one percent of the fault to plaintiff and thirty-nine percent to defendants.

On March 28, 2018, plaintiff filed a motion for a new trial or, in the alternative, for JNOV. On May 25, 2018, the trial court issued an order denying plaintiff's motions for reasons placed on the record.

II

We consider the denial of a Rule 4:49-1(a) motion for a new trial, applying the same standard as the trial court, with "considerable deference" to the trial court because it "has gained a 'feel of the case' through the long days of the trial." Lanzet v. Greenberg, 126 N.J. 168, 175 (1991); see also Caldwell v. Haynes, 136 N.J. 422, 431-32 (1994). However, "a trial court's determination is 'not entitled to any special deference where it rests upon a determination as to worth, plausibility, consistency or other tangible considerations apparent from the face of the record with respect to which [it] is no more peculiarly situated to decide than the appellate court.'" Id. at 432 (quoting Dolson v. Anastasia, 55 N.J. 2, 7 (1969)).

Rule 4:49-1(a) provides that a trial court may only grant a motion for a new trial "if, having given due regard to the opportunity of the jury to pass upon

the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law."  "A jury verdict is entitled to considerable deference[,]" and the motion "'should be granted only where to do otherwise would result in a miscarriage of justice shocking to the conscience of the court.'"  Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 521 (2011) (quoting Kulbacki v. Sobchinsky, 38 N.J. 435, 456 (1962)).  Such an injustice "can arise . . . from manifest lack of inherently credible evidence to support the finding, obvious overlooking or under-valuation of crucial evidence, [or] a clearly unjust result."  Ibid. (alteration in original) (quoting Lindenmuth v. Holden, 296 N.J. Super. 42, 48 (App. Div. 1996)).

Parties to an action "are entitled to have each of the jurors who hears the case, impartial, unprejudiced and free from improper influences."  Panko v. Flintkote Co., 7 N.J. 55, 61 (1951).  Undeniably, the "right to be tried before an impartial jury is one of the most basic guarantees of a fair trial." State v. Loftin, 191 N.J. 172, 187 (2007).  "That constitutional privilege includes the right to have the jury decide the case based solely on the evidence presented at trial, free from the taint of outside influences and extraneous matters." State v. R.D., 169 N.J. 551, 557 (2001).

> It is well settled that the test for determining whether a new trial will be granted because of . . . the intrusion of

11

irregular influences is whether such matters could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the [judge]'s charge. If the irregular matter has that tendency on the face of it, a new trial should be granted without further inquiry as to its actual effect. The test is not whether the irregular matter actually influenced the result, but whether it had the capacity of doing so. The stringency of this rule is grounded upon the necessity of keeping the administration of justice pure and free from all suspicion of corrupting practices.

[Panko, 7 N.J. at 61-62.]

"[T]he standard for authorizing a new trial [is] one that requires a determination that the jury's verdict [be] 'contrary to the weight of the evidence or clearly the product of mistake, passion, prejudice or partiality.'" Crawn v. Campo, 136 N.J. 494, 512 (1994) (quoting Lanzet, 126 N.J. at 175). A court must "'canvass the record . . . determine whether reasonable minds might accept the evidence as adequate to support the jury verdict . . . .'" Judge v. Blackfin Yacht Corp., 357 N.J. Super. 418, 424 (App. Div. 2003) (quoting Dolson, 55 N.J. at 6).

Our review of the denial of a motion for JNOV under Rule 4:40-2 is de novo "[a]lthough we defer to the trial court's feel for the evidence . . . ." Lechler v. 303 Sunset Ave. Condo. Ass'n, Inc., 452 N.J. Super. 574, 582 (App. Div.

2017). We do not, however, "owe [any] . . . special deference to the trial court's interpretation of the law." Ibid.

Like our review of a motion for a new trial, we apply the same standard that governs the trial courts. Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016). That standard requires that "if, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied[.]" Ibid. (alteration in original) (quoting Verdicchio v. Ricca, 179 N.J. 1, 30 (2004)). We do not consider "'the worth, nature or extent (beyond a scintilla) of the evidence,' but only review 'its existence, viewed most favorably to the party opposing the motion.'" Lechler, 452 N.J. Super. at 582 (quoting Dolson, 55 N.J. at 5-6).

## III

With these guiding principles in mind, we turn to plaintiff's contentions on appeal. We first consider plaintiff's argument that defense counsel's improper questioning concerning his ex-wife, Dr. Allen's advice, and the woman with whom he resided after his injury, prejudiced the jury and warrants a new trial.

Plaintiff primarily argues he was denied a fair trial because improper questioning led the jury to believe he abused his ex-wife. In support of this argument, plaintiff cites the "Me Too" movement, the live broadcast of the 90th Academy Awards, which aired during plaintiff's trial and championed the movement, and various statistics, to suggest a statistical probability that members of the jury were personally affected by sexual harassment, assault, or abuse. Plaintiff maintains that, even if a juror never personally experienced such trauma, the then-existing social climate nevertheless resulted in strong opinions on the issue. Therefore, plaintiff argues, the jury likely developed a negative bias against him.

Having reviewed the entire record, we discern no basis to disturb the trial judge's determination that his curative instructions, and permitting plaintiff to refute the suggestion that his ex-wife may have feared him, effectively addressed the concern that defense counsel's improper questions prejudiced the jury against plaintiff. See NuWave Inv. Corp. v. Hyman Beck & Co., 432 N.J. Super 539, 567 (App. Div. 2013). Although the issue of plaintiff's character is wholly irrelevant in a negligence case, prior to defense counsel questioning Browning about plaintiff's marital relationship, plaintiff questioned him regarding plaintiff's work in the community and as a minister. His testimony injected

14

plaintiff's character before defense counsel asked the question regarding plaintiff's ex-wife. We do not find defense counsel's improper question, when viewed in light of the trial judge's subsequent instructions and rulings, had the ability or "capacity" to improperly influence the jury's "ultimate decision making." Bender v. Adelson, 187 N.J. 411, 435 (2006).

Similarly, the trial judge took appropriate steps in response to defense counsel's questions concerning plaintiff's living arrangements and his comments relating to Dr. Allen's absence – he issued prompt and clear curative instructions. We are satisfied with the judge's objective evaluation that defendants' improper questions and comments did not result in prejudice to plaintiff's case.

We generally defer to the trial court's determination as to the effectiveness of the curative instruction. Khan v. Singh, 397 N.J. Super. 184, 202-03 (App. Div. 2007), aff'd, 200 N.J. 82 (2009). Whether "a comment by counsel is prejudicial and whether a prejudicial remark can be neutralized through a curative instruction or undermines the fairness of a trial are matters peculiarly within the competence of the trial judge." State v. Yough, 208 N.J. 385, 397 (2011).

Our review of the record in the present appeal confirms that defense counsel's challenged remarks, while inappropriate, did not cause a "miscarriage

of justice." We are satisfied that any prejudicial impact was obviated by the trial court's prompt and direct curative instruction.

IV

We next turn to plaintiff's contention that the weight of the evidence at trial does not support the jury's finding of comparative negligence, requiring a JNOV. Plaintiff primarily asserts defendants' expert provided an impermissible net opinion by opining plaintiff "did not observe his intended path of travel[,]" which he argues was speculative and unsupported by the record. Rejecting this argument, we conclude defendants' expert did not render a net opinion. We also conclude the record contained sufficient evidence that reasonably supports the jury's finding of contributory negligence.

An expert must offer more than "a mere net opinion." Pomerantz Paper Corp. v. New Comm. Corp., 207 N.J. 344, 372 (2011) (citing Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)); Buckelew v. Grossbard, 87 N.J. 512, 524 (1981)). "[A]n expert's bare opinion that has no support in factual evidence or similar data is a mere net opinion which is not admissible and may not be considered." Ibid. (citing Polzo, 196 N.J. at 583; Buckelew, 87 N.J. at 524). The expert must provide the "why and wherefore" that supports his or her opinion, "rather than a mere conclusion." Polzo, 196 N.J. at 583 (quoting State

16

v. Townsend, 186 N.J. 473 (2006)). "The admission or exclusion of expert testimony is committed to the sound discretion of the trial court." Townsend v. Pierre, 221 N.J. 36, 52, (2015) (citation omitted).

Here, Behnken opined that plaintiff's "actions were the primary cause, if not the sole cause of the accident" because he failed to observe his path of travel. Plaintiff did not object when Behnken offered this opinion; instead, plaintiff cross-examined Behnken extensively regarding the basis of his opinion. Behnken testified he reached his conclusion based on plaintiff's deposition testimony, stating he walked straight ahead as he normally would, without taking additional precautions. At that point, plaintiff's counsel read into the record the relevant portion of plaintiff's deposition.

Of note, plaintiff's counsel did not move in limine to bar Behnken from testifying at trial nor did he move to strike any portion of his trial testimony. Instead, it appears that plaintiff's counsel pursued a trial strategy to use plaintiff's deposition testimony to attack Behnken in front of the jury. While the deposition testimony did not strongly support Behnken's opinion, it also did not clearly undermine it. We are satisfied that Behnken did not offer an unsupported net opinion.

As the Court explained in <u>Townsend</u>, "The net opinion rule is not a standard of perfection. The rule does not mandate that an expert organize or support an opinion in a particular manner that opposing counsel deems preferable." <u>Id.</u> at 54. The failure of an expert "to give weight to a factor thought important by an adverse party does not reduce his testimony to an inadmissible net opinion if he otherwise offers sufficient reasons which logically support his opinion." <u>Rosenberg v. Tavorath</u>, 352 N.J. Super. 385, 402 (App. Div. 2002) (citing <u>State v. Freeman</u>, 223 N.J. Super. 92, 115-16 (App. Div. 1988).

When asked if he found fault with plaintiff's action of looking straight ahead, Behnken responded, "I find fault in that he wasn't watching where he was going. He wasn't looking at his intended path of travel. Looking straight ahead could be anything and I believe, as the jury knows, he didn't look down prior to his fall."

Moreover, we note that plaintiff testified that he observed "a light coating of snow and moisture" on the ground as he exited the building but then proceeded down the walkway, looking straight ahead, as he normally did. In addition, defendants presented testimony they did not violate the city code regarding treatment of a walkway.

The jurors were entitled to make credibility findings and to give the weight they deemed appropriate to the evidence submitted. According defendants the benefit of all inferences which can be reasonably deduced from the evidence presented at trial, we are satisfied that reasonable minds could differ regarding the final result. We therefore find no reason to disturb the trial court's denial of plaintiff's motion for JNOV. We are satisfied the jury's verdict did not constitute a miscarriage of justice under the law.

Any arguments not specifically addressed lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4758-17T2